STATE v. JAMES ALFORD PRICE.

(Filed 11 October, 1967.)

**1. Criminal Law § 169—**

Exceptions to the exclusion of evidence cannot be sustained when the record fails to show what the witness would have testified if permitted to answer.

**2. Homicide § 13—**

Where the evidence establishes that the defendant intentionally assaulted another with a deadly weapon and thereby caused the death of the person assaulted, the presumption arises that the killing was unlawful and with malice.

**3. Homicide § 23—**

Instructions as to the presumptions arising from the intentional use of a deadly weapon *held* without error in this case.

**4. Homicide § 27—**

The court's charge relating to self-defense and defense of home and family held free of prejudicial error in this case.

**5. Homicide § 12;   Criminal Law § 24—**

Under the general plea of not guilty, a defendant may rely upon more than one defense.

**6. Homicide § 27—**

Defendant's testimony was to the effect that he intentionally fired three shots in the immediate area where the deceased was standing in order to warn him away from defendant's premises, and that the deceased was killed by the third shot. *Held:* Defendant's evidence does not present the defense of death by accident, since it discloses that he intentionally assaulted the deceased with a deadly weapon, and it was not error for the court to fail to charge the jury upon the defense of death by accident.

**7. Homicide § 26—**

In this homicide prosecution the failure to charge the jury with reference to involuntary manslaughter was not error, since there was no evidence to support such instruction.

APPEAL by defendant from *Peel, J.,* March 13, 1967 Schedule "C" Criminal Session of MECKLENBURG.

Criminal prosecution on indictment charging that defendant, on November 26, 1966, "did unlawfully, wilfully, feloniously but without premeditation and deliberation kill and murder Walter Junior Wright," etc.

Evidence was offered by the State and by defendant.

The evidence, summarized except when quoted, tends to show the facts narrated below.

On November 26, 1966, defendant, standing on the porch of his trailer, fired a .38 caliber Smith and Wesson pistol three times. The third shot struck and fatally injured Wright, striking him "in the bridge of the nose, just slightly over to the side." Wright, defendant's father-in-law, when killed, was "in the front yard of the (defendant's) trailer . . . 42 feet from the front door of the trailer and approximately 33 feet from the edge of Skycrest Drive." When he fired the pistol, defendant was standing "halfway out on the 4 ft. wide porch."

Both Wright and defendant resided in the same trailer park, which was located off Highway 115, North, in Mecklenburg County. The trailer in which Wright, Wright's wife, and also Maxine Price, the fifteen-year-old daughter of defendant, resided, was across Skycrest Drive from the trailer in which defendant, his wife and other members of their family resided.

Wright was fifty-eight years of age. He had been disabled since 1961 and was constantly under a doctor's care. On November 26, 1966, and prior thereto he was unemployed. Defendant was forty-seven years of age, weighed 190 pounds, and was taller than Wright.

On November 26, 1966, about 1:00 p.m., Wright went upon the premises and into the trailer of defendant. There was evidence tending to show he had been drinking (wine) heavily. While in defendant's trailer on this occasion, Wright approached both defendant and Roger Charles, a Sergeant in the U. S. Armed Forces and son-in-law of defendant, cursing them and threatening to strike them with a pop bottle and with a knife. Defendant's wife fainted. Defendant told Wright he wanted no trouble with him, told him to leave and not come back. Wright left and returned to his trailer.

Wright and his wife and Maxine Price had been caring for the eighteen months old child of Brenda Price, a daughter of defendant, while Brenda worked as a waitress. About 3:30 or 4:00 p.m., Brenda went to the Wright trailer to get her child. Wright told Brenda, speaking of defendant and of Charles: "Both of them were chicken. Neither of them would fight me." Wright, apparently resenting the fact that Brenda had taken the child, threw the articles of clothing belonging to the baby out into the yard. These were picked up by Maxine, put in a box and taken to Brenda. Shortly thereafter Wright left his trailer and crossed Skycrest Drive. Charles, who was in the Price trailer, testified: "Mr. Wright proceeded to come in the yard and Mr. Price got the pistol and says: 'I will scare him away.' I said: 'Don't shoot him.' He said, 'I won't.'"

Defendant testified: "I got the gun and said, 'I can't have him back over here today,' and pushed the front door open. My daughter asked me not to let him come in. He started across a little valley and I said, 'Mr. Wright, I told you not to come back.' He said, 'Damn your soul, I'm coming after you now.' I said, 'No, go back.' He said, 'I'm going to get you.' He had his right hand in his right rear pocket and I shot at the ground. He kept coming saying, 'You s. o. b., you are not going to shoot nobody. You ain't got the nerve as I have.' I shot again and the baby ran out and grabbed both my legs. As I raised my gun to shoot again at his feet my daughter grabbed the baby. As she snatched, the gun was fired and I looked and he was backing up. He stumbled back 3 or 4 steps, then stopped,

shook his head and said, 'Damn you,' and fell. I turned around to walk inside to call an ambulance."

Jeannette (Mrs. Charles), daughter of defendant, testified: "My father was in the living room when I saw my grandfather come out of his driveway. I was afraid of him because he hit me Thanksgiving day. I hadn't done anything and was pregnant. My father got a gun and went to the door and said, 'Jeannette, I'm not going to shoot. I'm just going to scare him away.' I heard my father tell my grandfather, 'Walter, don't come any closer. I told you not to come back over here,' and my grandfather said, 'I'm going to get you anyway.' My little girl ran between my daddy's legs crying. My father used the pistol that's been introduced in evidence and fired it 3 times — I saw the first two hit the ground, because the dirt threw up. The third one hit him fired while I was standing behind daddy attempting to get my little girl. She was right between his legs holding on to him."

Defendant testified: "You could say I was in the doorway when it happened. I was not aiming the gun and he could see the gun and heard the shots. When my daughter grabbed the girl it could have pulled me in the air."

Defendant testified to prior threats and assaults made upon him by Wright when Wright was drinking and also to Wright's general reputation for violence when drinking. Defendant testified: "I had known Mr. Wright about 23 years. When he was drinking, he was bad, a different person altogether, he would cut or slap you. When he wasn't drinking he was all right. He has served time for cutting a man and has cut me. He shot at me before. I was afraid of him and was protecting my family on that day."

No weapon was found on Wright's body except a closed pocketknife recovered from his "left rear pocket underneath a handkerchief."

Defendant testified: "I don't know the interval between the shots but there was a pause for conversation — not bang, bang, bang." Testimony of other witnesses tended to show three shots were fired in quick succession.

The jury returned a verdict of guilty of manslaughter. Judgment, imposing a prison sentence of not less than nine nor more than ten years was pronounced. Defendant excepted and appealed.

*Attorney General Bruton and Assistant Attorney General Rich for the State.*

*E. Glenn Scott for defendant appellant.*

BOBBITT, J. Defendant's wife, while testifying in behalf of her husband, was asked on direct examination the following question:

"Do you know your father's reputation for the use of violence, particularly when he was under the influence of alcoholic beverages?" The State objected, the court sustained the objection and defendant excepted to the court's ruling. Defendant's assignment of error based on this exception is without merit. Since the record does not show what the witness would have testified if permitted to answer, it cannot be determined whether the ruling was prejudicial. *State v. Poolos,* 241 N.C. 382, 85 S.E. 2d 342. It is noted that the court admitted evidence that Wright had a general reputation for violence while drinking and evidence of Wright's specific acts of violence toward defendant while drinking.

Defendant excepted to and assigns as error excerpts from the charge relating to what must be established to raise the presumptions that the killing was unlawful and with malice. It is well established that these presumptions arise "when the defendant *intentionally assaults* another with a deadly weapon and thereby proximately causes the death of the person assaulted." *State v. Gordon,* 241 N.C. 356, 358, 85 S.E. 2d 322, 323, and cases cited; *State v. Adams,* 241 N.C. 559, 85 S.E. 2d 918; *State v. Wagoner,* 249 N.C. 637, 107 S.E. 2d 83; *State v. Revis,* 253 N.C. 50, 116 S.E. 2d 171; *State v. Phillips,* 264 N.C. 508, 515, 142 S.E. 2d 337, 340. When considered in the light most favorable to the State, there was plenary evidence tending to show defendant intentionally shot Wright and thereby proximately caused Wright's death. Error, if any, in the court's instructions on this feature of the case was in favor of and not prejudicial to defendant.

Defendant excepted to and assigns as error portions of the charge relating to defendant's rights when acting in his own defense and in defense of his home and family. Careful consideration of the court's instructions on this feature of the case does not disclose prejudicial error. These instructions are in substantial accord with numerous decisions of this Court.

Defendant's more serious exceptions and assignments of error relate to portions of the charge as given bearing upon whether the actual shooting of Wright was of an accidental nature and upon whether the court failed to charge fully "on the issue of accidental death and the possibility of a verdict of involuntary manslaughter."

The court instructed the jury in substance as follows: If the jury found the actual shooting of Wright was not intended by defendant but was accidental, this fact was for consideration in determining whether defendant used excessive force under the circumstances in defense of himself and of his home and family.

Defendant contends the jury should have been instructed to return a verdict of not guilty if they found defendant did not intend

that the bullet discharged from the pistol he fired would actually strike Wright; and that it was error to limit the significance of such fact to consideration in determining whether defendant used excessive force in defense of himself and of his home and family. This contention is untenable.

Defendant contends, and rightly so, that in an appropriate factual situation, a defendant, under his plea of not guilty, may rely on more than one defense, *e.g.,* (1) that he acted in self-defense, and (2) that the shooting was accidental. Appropriate circumstances for the assertion of these defenses were present in *State v. Wagoner, supra,* where the evidence as to accidental shooting tended to show that the pistol was not intentionally fired but discharged accidentally.

Here, there is no evidential basis for a contention that the firing of the pistol was unintentional. The accident here, according to defendant's contention, is that defendant did not intend that any bullet from the intentionally fired pistol would actually strike Wright. The evidence most favorable to defendant tends to show it was his intention that the third bullet, as well as the prior two bullets, would strike in the area where Wright was standing and sufficiently close to him to put him in fear.

It is well established "that no man by the show of violence has the right to put another in fear and thereby force him to leave a place where he has the right to be." *State v. Martin,* 85 N.C. 509; *State v. Douglas,* 268 N.C. 267, 150 S.E. 2d 412. Here, on his own testimony, defendant assaulted Wright with a deadly weapon, thereby proximately causing Wright's death, and therefore was guilty of manslaughter, at least, *unless* he fired the pistol under such circumstances that the firing of the pistol was or reasonably appeared to be necessary in his own defense or in defense of his home or family. This was a matter for determination by the jury in the light of all circumstances disclosed by the evidence.

Defendant's guilt or innocence depended upon whether he acted within the limits of his legal right to defend himself, his home and his family. This conclusion is in accord with the court's instructions. Moreover, the court did not err by failing to instruct the jury with reference to involuntary manslaughter. There was no evidential basis for such instruction.

The record reveals another family tragedy. Apparently, Wright, when he was sober, enjoyed a cordial relationship with other members of the family, including defendant. However, when he was under the influence of intoxicants, it would seem that he became abusive, rowdy and combative. The jury seems to have evaluated the evidence properly, namely, by deciding that defendant under all

GASTONIA *v.* PARRISH.

the circumstances, notwithstanding his patience may have been exhausted, used more force than was or reasonably appeared to be necessary to defend and protect himself, his home and his family. The verdict of guilty of manslaughter and the judgment pronounced thereon will not be disturbed.

No error.