STATE OF NORTH CAROLINA v. EARLINE WOODS

No. 57

(Filed 10 March 1971)

1. Homicide § 14— presumptions — unlawfulness of homicide — malice — proof of intentional assault with deadly weapon

The presumption that a homicide was unlawful and done with malice arises not only upon proof or admission of an intentional killing with a deadly weapon but also when the defendant *intentionally assaults* another with a deadly weapon and thereby proximately causes the death of the person assaulted.

2. Homicide § 14— presumptions — burden of proof on the State — proximate cause of death

No presumption arises against a defendant and no burden is cast upon him until the State has satisfied the jury beyond a reasonable doubt, or the defendant has judicially admitted, that he assaulted the deceased with a deadly weapon and thereby inflicted a wound which proximately caused his death.

3. Homicide § 23— instructions on proximate cause of death

*Femme* defendant who testified that she intentionally fired a rifle in the deceased's direction and that its discharge hit him, but who did not admit that the wound so inflicted caused his death, *is held* entitled to the explicit instruction that the jury should return a verdict of not guilty if the State failed to prove beyond a reasonable doubt that the bullet wound proximately caused the deceased's death.

4. Homicide § 23— instructions on return of not guilty verdict

Instructions in a homicide prosecution which permitted the jury to return a verdict of not guilty only if they found that defendant acted in lawful self-defense, *held* reversible error.

5. Homicide § 9— self-defense — use of excessive force

A defendant who had reasonable grounds to believe that it was necessary to shoot the deceased to save herself from death or great bodily harm did not use excessive force in shooting the deceased.

6. Homicide § 9— self-defense — use of excessive force

One who uses excessive force while fighting in self-defense is guilty of voluntary manslaughter, not involuntary manslaughter.

7. Homicide § 11— accident or misadventure — burden of proof

Accident or misadventure is in no sense an affirmative defense shifting the burden of proof to a defendant in a homicide prosecution, but it is merely a denial that defendant has committed the crime.

8. **Homicide § 11— homicide prosecution — question of accident — insufficiency of evidence**

The question of accident did not arise in a homicide prosecution in which the defendant testified that she "aimed to miss" the deceased and that she shot him "accidentally" while intending to shoot close enough to scare him.

9. **Homicide §§ 5, 21— second-degree murder — firing at close range in deceased's direction**

A defendant who intentionally fired her gun at close range in the deceased's direction and thereby caused his death would be guilty of murder in the second degree unless she was entitled to shoot in self-defense.

10. **Homicide § 23— instructions on proximate cause of death — disapproval of the phrase "natural and probable result"**

A manslaughter instruction that the jury must be satisfied beyond a reasonable doubt that the victim's death was the "natural and probable result" of a wound intentionally inflicted by defendant is disapproved, the crucial question being whether the death was *proximately caused* by the wound.

APPEAL by defendant from *Long, J.*, June 1970 Session of ROWAN, transferred for initial appellate review by the Supreme Court under an order entered pursuant to G.S. 7A-31(b)(4), argued at the Fall Term 1970 as Case No. 94.

Defendant was tried upon indictment which charged her with the first-degree murder of Edward Terry on 1 May 1970. The solicitor, however, elected not to prosecute defendant for murder in the first degree. Evidence for the State tended to show:

Defendant resided at 1126 West Bank Street in the City of Salisbury, where she and Terry lived together. About 12:15 a.m. on 1 May 1970, John Chambers saw defendant standing alone on the corner of Lloyd and Banks Streets. She asked him if he had seen Terry. He had not, and she told him she was going to shoot Terry.

About 12:40 a.m., in response "to a complaint about some shooting," Police Officer R. E. Raper went to defendant's home. He found her on the front porch. She told him she had heard some shooting but had done none herself. While defendant and the officer were talking, Terry appeared between defendant's house and the house next door. Terry was intoxicated and defendant appeared "quite upset" with him. She told Terry

that she was going to give him a whipping which would send him to the hospital. The officer advised them to settle their difference without resorting to violence. Defendant told him that "talking would not do any good, but that there would be no shooting." When Officer Raper drove away, Terry was sitting in a chair on the porch, and defendant had gone into the house.

After the officer left, Janet Muskelly, who lived next door, was "having a remark" with defendant, who had returned to her porch. Defendant said to Mrs. Muskelly, "I heard the remark you said. That is my husband and I'll shoot him when I get ready." At that time defendant had a rifle in her hand, and Terry was standing behind the house. After explaining that it was another woman who had been "remarking," Mrs. Muskelly went into the house. Within a few minutes she heard two shots.

In consequence of another complaint, Officer Raper returned to West Bank Street about 1:05 a.m. He found defendant standing in the street about 75 feet from her house. She said to him, "I think he'll live; I shot him." Terry was lying unconscious on the sidewalk in front of the house. The officer called an ambulance and Terry was carried to the hospital. He was dead on arrival. In the opinion of the physician, who examined Terry, death resulted from a bullet wound. The bullet had entered his thigh, "crossed the femoral artery and vein, and lodged in his stomach."

After the ambulance left, defendant handed Officer Raper a .22-caliber semi-automatic rifle. From it he removed four bullets of the "long rifle type." He arrested defendant and took eight rounds of live ammunition from her pocketbook.

Defendant's testimony tended to show: She and deceased were married "only by common law." They had lived together as husband and wife ten years, five months, and two days. Terry had difficulty keeping a job because of his drinking. On 1 May 1970 he got off work about 6:00 p.m., but he did not come home until midnight. At that time he was "high on whiskey." His alibi did not withstand defendant's cross-examination, and they were in the midst of "an argument" when Officer Raper arrived the first time. He left Terry and defendant wrestling over the rifle on the porch. The rifle fell to the floor; defendant got it and backed into the house against a chair just opposite the

State v. Woods

door. When Terry started in defendant said to him, "Don't come in; I am not going to let you get this rifle and shoot me no more." His reply was, "Hell, I'm going to take it." Intending to scare him by shooting past him she "shot to miss him and hit him." She said, "I intended to shoot past him. I intended to scare him. . . . I did not intend to shoot him or to hurt him in any way."

Terry, defendant said, "was wonderful when he was sober, but when he started drinking he'd always come home to jump on (her)." The preceding Easter he had shot her in the head and, because of that episode, prior shootings and beatings, she was afraid of him on that night. After he was shot she went across the street to telephone for an ambulance. It was then that she saw Officer Raper. When he asked her what happened she told him that she shot Terry in the leg to keep him away from her; that she "was shooting by him" and did not mean to hit him. Defendant denied making the statements attributed to her by Chambers and Muskelly. She admitted prior convictions for "fighting," aggravated assault, drunkenness, selling nontaxpaid whiskey, "drunk and disorderliness and resisting arrest."

Defendant's sister, one of deceased's co-workers, and a neighbor corroborated defendant's testimony that Terry had shot defendant without provocation the preceding Easter, had assaulted her at other times, and that "he was a pretty rough fellow when he was drinking."

The court charged the jury it could return one of four verdicts: Guilty of murder in the second degree, voluntary manslaughter, involuntary manslaughter, or not guilty. The verdict was guilty of voluntary manslaughter. From the judgment of the court that she be imprisoned for a term of not less than six nor more than twelve years defendant appealed.

*Attorney General Robert Morgan; Assistant Attorney General William W. Melvin; and Trial Attorney Donald M. Jacobs for the State.*

*Robert M. Davis for defendant appellant.*

SHARP, Justice.

Defendant brings forward only assignments of error relating to the charge. Assignments Nos. 3 and 6 require discussion.

The portion of the charge which is the subject of Assignment No. 3 follows:

"Where a killing is shown to be intentional, and without legal provocation, and without just cause or excuse or where the killing is shown to be done with a deadly weapon, or in a cruel or in a brutal manner, then the law implies that it was done with malice. When it is established by the evidence that the defendant intentionally killed the deceased with a deadly weapon the law raises two and only two presumptions against him. First, that the killing was unlawful and second, that it was done with malice; an unlawful killing with malice is Murder in the Second Degree.

"When the intentional killing of a human being with a deadly weapon is established by the evidence, there is cast upon the defendant in this case, Earline Woods, the burden of proving to the satisfaction of the jury—not by the greater weight of the evidence, nor beyond a reasonable doubt, but simply to the satisfaction of the jury—the legal provocation that will rob the crime of malice and thus reduce it to manslaughter or that will excuse it altogether upon the grounds of self-defense, accident or misadventure."

Following the excerpt quoted above the judge gave a further exposition of murder in the second degree, instructions upon voluntary and involuntary manslaughter, and a statement of the law of self-defense. Then, after a brief summary of the evidence, he delivered his final mandate. The substance of this instruction, which is the basis of Assignment No. 6, is summarized below:

If the State has satisfied you beyond a reasonable doubt that defendant, by means of a deadly weapon, intentionally inflicted the wound which produced Terry's death it would be your duty to return a verdict of guilty of murder in the second degree unless defendant has satisfied you that she shot Terry in self-defense. If you are satisfied beyond a reasonable doubt that defendant intentionally shot Terry and that his death "was the natural and probable result," but you are not satisfied be-

yond a reasonable doubt that she shot him with malice, your verdict will be voluntary manslaughter unless defendant has satisfied you she shot Terry in self-defense. If you are not satisfied beyond a reasonable doubt that defendant shot Terry intentionally but are satisfied beyond a reasonable doubt that she shot him in the commission of some unlawful act and his death "was a natural and probable result," your verdict will be guilty of involuntary manslaughter "even though the wounding of the deceased was unintentional," unless defendant has satisfied you she shot in self-defense. Although the State may have satisfied you beyond a reasonable doubt that defendant shot and killed Terry, if she has satisfied you that she was not the aggressor and that she shot Terry under circumstances which created in her mind the reasonable belief that it was necessary to shoot him in order to save herself from death or great bodily harm, it would be your duty to return a verdict of not guilty. However, even if defendant has satisfied you she was not the aggressor and she shot Terry under circumstances which reasonably caused her to believe "that the shooting of the deceased was necessary in order to save herself from death or great bodily harm," yet if she "fails to satisfy you that the forces used were not excessive under the circumstances, it would be your duty to return a verdit of guilty of involuntary manslaughter, or if you find the defendant was the aggressor then the plea of self-defense would not be available to her."

Defendant asserts that the foregoing excerpts from the charge are fatally defective in the following respects: (1) The judge failed to instruct that until the State satisfied the jury beyond a reasonable doubt defendant intentionally shot Terry *and* thereby proximately caused his death, no presumption arose that the killing was either unlawful or done with malice. (2) Although the judge instructed the jurors under what circumstances they should return a verdict of guilty of murder in the second degree or manslaughter, and how murder in the second degree could be reduced to manslaughter, it was only in the event they found defendant to have acted in lawful self-defense that he specifically told them they could or should return a verdict of not guilty. These contentions must be sustained.

The State's evidence tended to show that defendant intentionally shot Terry after having announced her intention to kill him and that he died as a result of the bullet wound she

inflicted. Defendant's evidence (her testimony) tended to show that after scuffling with Terry over the rifle on the front porch of their residence she got possession of the weapon and went into the house; that Terry said he was going to take the rifle from her and, despite her warning to him not to come in, he started into the house; that, because he had previously shot her, she was afraid of him, and she "shot to miss him and hit him"; that her only purpose in shooting was to scare him. All the evidence, therefore, tends to show that defendant intentionally fired the shot which struck Terry. It must be kept in mind, however, that she made no judicial admission that he died as a result of the wound she inflicted.

[1, 2] The presumption that a homicide was unlawful and done with malice arises not only upon proof or admission of an intentional killing with a deadly weapon but also "when the defendant *intentionally assaults* another with a deadly weapon and thereby proximately causes the death of the person assaulted." *State v. Gordon,* 241 N.C. 356, 358, 85 S.E. 2d 322, 323, and cases cited; *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Price,* 271 N.C. 521, 157 S.E. 2d 127; *State v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337. However, no presumption arises against a defendant and no burden is cast upon him until the State has satisfied the jury beyond a reasonable doubt, or the defendant has judicially admitted, that he assaulted the deceased with a deadly weapon and thereby inflicted a wound which proximately caused his death. Here a specific instruction to this effect was not given.

[3] Although defendant testified that she intentionally fired the rifle in Terry's direction and that its discharge hit him, she did not admit that the wound thus inflicted caused his death. She was, therefore, entitled to the explicit instruction, even in the absence of a specific request therefor, that the jury should return a verdict of not guilty if the State failed to prove beyond a reasonable doubt that a bullet wound inflicted by defendant proximately caused Terry's death. "The necessity for such instruction is not affected by the fact there was plenary evidence upon which the jury could base (such) a finding. . . . " *State v. Ramey,* 273 N.C. 325, 329, 160 S.E. 2d 56, 59; *State v. Howell,* 218 N.C. 280, 10 S.E. 2d 815. In *State v. Redman,* 217 N.C. 483, 486, 8 S.E. 2d 623, 625, Justice Barnhill (later Chief Justice)

State v. Woods

said: "For the failure of the court . . . to require the jury to find beyond a reasonable doubt, upon the evidence offered, that the defendant killed the deceased with a deadly weapon, before casting any burden upon the defendant to go forward with proof tending to mitigate the killing or to excuse it altogether, there must be a new trial."

[4] Both the factual situation and the charge in this case are similar to those in State v. Ramey, supra, and defendant has apparently based her assignments of error upon the opinion in that case. In awarding a new trial in Ramey, Chief Justice Bobbitt said:

"The only portions of the charge in which the jury was instructed as to circumstances under which they might return a verdict of not guilty relate directly and solely to the return of a verdict of not guilty in the event the jury found defendant acted in the lawful exercise of his right of self-defense.

". . . .

". . . It is noted that no instruction was given that if the State failed to satisfy the jury from the evidence beyond a reasonable doubt that defendant was guilty of murder in the second degree, and failed to satisfy the jury from the evidence beyond a reasonable doubt that defendant was guilty of manslaughter, the jury should return a verdict of not guilty." State v. Ramey, supra at 328, 329, 160 S.E. 2d at 58, 59.

Upon the authority of State v. Ramey, supra, and the cases cited therein, we award defendant a new trial for the errors indicated. However, we also deem it appropriate to call attention to certain additional errors in the charge.

[5, 6] In the mandate, the judge instructed the jurors to return a verdict of involuntary manslaughter in the event defendant satisfied them she shot Terry in the reasonable belief "that the shooting of the deceased was necessary in order to save herself from death or great bodily harm" but failed to satisfy them that the force she used was not excessive under the circumstances. Obviously this charge incorporates contradictions. If defendant had reasonable grounds to believe that it was necessary to shoot Terry to save herself from death or great bodily harm, she did not use excessive force in shooting him. Furthermore, when one who is fighting in self-defense uses excessive force he is guilty

of *voluntary* manslaughter. *State v. Ramey, supra; State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305. There was in this case no evidence which would have justified a verdict of involuntary manslaughter.

In the second paragraph of the excerpt from the charge quoted at the beginning of this opinion, the judge instructed that once "the intentional killing of a human being with a deadly weapon" is established, it is encumbent upon the defendant to satisfy the jury of facts which would reduce the crime to manslaughter or excuse it altogether on the ground of self-defense, *accident or misadventure.*

[7] We have repeatedly held that accident or misadventure is in no sense an affirmative defense shifting the burden of proof to the defendant to exculpate himself from a charge of murder. On the contrary, it is merely a denial that the defendant has committed the crime, and the burden remains on the State to prove that the defendant *intentionally assaulted* the deceased with a deadly weapon and thereby proximately caused his death before any presumption arises against him. *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652; *State v. Mercer, supra; State v. Fowler,* 268 N.C. 430, 150 S.E. 2d 731; *State v. Phillips, supra.* Nothwithstanding, the phrase "accident or misadventure" lingers in the notebooks of trial judges and continues to haunt their charges with reference to the burden of proof which devolves upon a defendant to rebut the presumptions arising from a killing proximately resulting from the intentional use of a deadly weapon.

[8, 9] Defendant makes no contention that she discharged the rifle accidentally. Her contention is that she "aimed to miss"; that *intending* to shoot close enough to scare him but not to hit him, she shot him "accidentally." However, defendant shot from a front room, or hall, through the front door toward Terry, who had started to come into the house from the porch. Under these circumstances the question of accident does not arise. At such close range and in such close quarters, if defendant intentionally fired the gun in Terry's direction and thereby caused his death, she would be guilty of murder in the second degree unless she was entitled to shoot in self-defense. *State v. Price, supra; see State v. Freeman,* 275 N.C. 662, 170 S.E. 2d 461; *State v. Cooper, supra.*

[10] In his mandate with reference to second-degree murder the judge correctly charged that the State must prove beyond a

reasonable doubt that defendant "intentionally inflicted with a deadly weapon *the wound which produced the death*" of Terry. Subsequently, however, in charging upon manslaughter he twice told the jury they must be satisfied beyond a reasonable doubt that Terry's death "was the (a) natural and probable result" of a wound intentionally inflicted by defendant. The use of the phrase "natural and probable result" is disapproved. The crucial question is whether a wound inflicted by an unlawful assault *proximately caused* the death—not whether death was a natural and probable result of such a wound and should have been foreseen. Foreseeability is not an element of proximate cause in a homicide case where an intentionally inflicted wound caused the victim's death.

New trial.